UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------X
ALEXANDER SANTANA,                                    :

                Petitioner,                    :         15 Civ. 2818 (WHP) (GWG)

   -v.-                                               :         <u>REPORT AND
                                      RECOMMENDATION</u>
MICHAEL CAPRI, Superintendent,                      :
Sing Sing Correctional Facility,
                                    :

                Respondent.                   :
--------------------------------------------------------------X

**GABRIEL W. GORENSTEIN, UNITED STATES MAGISTRATE JUDGE**

      Petitioner Alexander Santana, currently an inmate in state custody at the Sing Sing

Correctional Facility, brings this petition seeking a writ of habeas corpus.[1]  Santana challenges

the conviction underlying his imprisonment based on alleged ineffective assistance of trial

counsel.

      As set forth in Santana's memorandum of law, Santana asserts that he received

ineffective assistance of counsel when his trial counsel (1) abandoned a previously raised

justification defense; (2) failed to object to the introduction of video evidence; (3) failed to

question a juror about his statement that he was familiar with a member of the audience who

turned out to be an assistant district attorney; (4) opened the door to hearsay testimony that

violated the Confrontation Clause; and (5) opened the door to a missing witness argument in the

---

[1]  Amended Petition Under 28 U.S.C. §2254 for a Writ of Habeas Corpus & Request for
an Evidentiary Hearing, filed Aug. 26, 2016 (Docket # 20) ("Am. Pet."); Memorandum of Law,
filed Sept. 2, 2016 (Docket # 21) ("Pet. Mem."); Declaration in Opposition to Petition for a Writ
of Habeas Corpus, filed Dec. 21, 2016 (Docket # 24) ("Braun Decl."); Memorandum of Law,
filed Dec. 21, 2016 (Docket # 25) ("Resp. Br.").

prosecution's closing argument.  Pet. Mem. at 8; Am. Pet. at 5-6.[2]

For the reasons discussed below, Santana's petition should be denied.

I. BACKGROUND

A. Underlying Offense, Trial, and Conviction

In brief, during the early-morning hours of January 1, 2008, Santana and Kenneth

McClinton were involved in an altercation in the Bronx.  McClinton was armed with a baseball

bat.  An argument between McClinton and Santana escalated into a physical fight that was joined

by the friends and family of McClinton and Santana.  After a large group fight in the street,

McClinton, still armed with a bat, chased Santana and his family into their apartment building

before exiting.  At this point the crowd dispersed.  As the crowd broke up, someone took the bat

from McClinton.  Santana and his supporters in the fight then chased after McClinton.  See

Respondent's Brief, dated Dec. 10, 2013 (attached as Ex. 6 to Braun Decl.) ("Resp. Appeal

Brief"), at 3-7; Brief for Defendant-Appellant, dated July 2, 2013 (attached as Ex. 5 to Braun

Decl.) ("Pet. Appeal Brief"), at 4-6.

McClinton's cousin Tiffany witnessed Santana and others catch up to McClinton, restrain

him, and stab him repeatedly with a knife.  (T. McClinton: Tr. 290-93, 336-38).[3]  Another

---

[2]  Santana's petition also recites the following claim: "Petitioner's trial counsel failed to call the defendant or introduce the defendant's custodial statement in a case where his trial strategy was one of justification."  Am. Pet. at 6.  This issue is not briefed in his memorandum of law.  Accordingly, we assume it is not being pursued.  We note that petitioner concedes that "[t]his issue was not raised on direct appeal or petitioner's post-conviction motion."  Id.  Thus, we assume that petitioner has concluded that the exhaustion doctrine would bar its consideration here anyway.  See section II.C below.

[3]  The trial took place on May 24, May 25, May 26, May 27, June 1, June 2, June 3, June 4, June 8, June 9, 2010.  The transcripts are attached as Attachments 2, 3, and 4 to Docket # 28 ("Tr.").  When a specific witness's testimony is being referenced, the citation "_____: Tr." refers to the name of the witness testifying on the indicated pages of the transcript.

witness, Donisha Riggins, a woman dating McClinton's brother, saw Santana "stab[ McClinton] in his heart," then run away to Santana's apartment building. (Riggins: Tr. 384-87). A co-defendant also stabbed McClinton. (T. McClinton: Tr. 292). McClinton died from his wounds shortly after being stabbed. (See Beltre: Tr. 46-51; Smiddy: Tr. 535-37, 546).

The police's "ARGUS" system maintained video surveillance of the area where the initial brawl took place (Cunningham: Tr. 185; Heanue: Tr. 442-43), but the area where the stabbing occurred was out of the field of view of the panning ARGUS cameras, Resp. Appeal Brief at 10; Heanue: Tr. 444-46. Nonetheless, the ARGUS video did show that (1) Santana was armed with two knives, one in each hand, shortly before the stabbing; (2) Santana was running toward the spot where McClinton's body was found; and (3) Santana's clothes were stained in blood shortly after the time of the stabbing, while the clothes of an individual charged along with Sanchez were not bloodstained. (See Heanue: Tr. 448-52, 455-56).

Video surveillance from inside Santana's apartment building showed Santana and the co-defendant return to his building after the stabbing and enter an elevator. (Ponce: Tr. 224-27). This video shows the co-defendant in the elevator dropping a knife, which Santana then picked up. (Ponce: Tr. 226-27).

Police Officer Ponce and Sergeant Hennessy arrived at the scene of the crime to find McClinton lying on the ground dying. (Ponce: Tr. 193-95). Tiffany McClinton and other women on the scene then directed Officer Ponce's attention to Santana and the co-defendant. (See Ponce: Tr. 199-201; T. McClinton: Tr. 295-98). Officer Ponce had other police officers bring Santana to him and noticed blood on Santana's clothes, while Sergeant Hennessy saw blood on Santana's hands. (See Ponce: Tr. 201-02; Hennessey: Tr. 78-79, 115). Santana and the co-defendant were then arrested. (See Ponce: Tr. 201-03; Hennessey: Tr. 78-79; T. McClinton:

Tr. 298).

A detective investigating the crime scene, Detective Heanue, collected and vouchered Santana's shirt from the night of the stabbing (Heanue: Tr. 439-40), which was stained with blood that the Office of the Chief Medical Examiner later determined came from McClinton (Nori: Tr. 582, 583). McClinton's blood was found on Santana's shoes and jeans as well. (Nori: Tr. 583-84). Another detective assigned to investigate McClinton's death, Detective Cunningham, recovered several knives from near the crime scene, one of which had a bent blade with blood on it. (Cunningham: Tr. 147-53, 156). The blade of the bent knife contained blood from McClinton, and Santana was a minor contributor of DNA found on the knife's handle. (Nori: Tr. 589-90, 592-93). Testimony showed that the knife with the bent blade could have caused two of the three stab wounds found on McClinton's body, either of which alone would have been enough to cause McClinton's death. (Smiddy: Tr. 536-37, 543-44). One wound the knife with the bent blade could have caused was the perforation of the lower border and protective membrane of McClinton's heart, as well as the perforation of McClinton's aorta. (Smiddy: Tr. 533, 537, 544). Riggins, who saw Santana stab McClinton in the heart, gave an in-court identification of Santana. (Riggins: Tr. 384-86).

The prosecution was able to admit the ARGUS video at trial on consent of Santana's counsel. Tr. 424, 443, 502-03; Pet. Appeal Brief at 11-12, 16; Resp. Appeal Brief at 44-46. In a portion of the video played for the jury, Santana can be seen with a knife in both hands, running towards the location where McClinton's body was eventually discovered with stab wounds. See Pet. Appeal Brief at 12; Heanue: Tr. 448-49. Outside the presence of the jury, the trial judge described this portion of the video as showing Santana "appearing to be hunting down someone." (Tr. 509).

After viewing the video in front of the jury — and after the video was admitted — Santana's trial counsel said he had never seen certain portions of the ARGUS video before the morning that it was admitted. (Tr. 499). Counsel then objected to the prosecution's failure to provide the video before the day it was admitted, and stated that the surveillance evidence produced to him before trial did not contain the footage showing Santana apparently "hunting" someone. (Tr. 499-501). The trial court responded that "this morning before the jury was here, all of us sat here and watched at least twice while this tape was played and nobody said anything. . . . [T]hen it was played twice for the jury, not a peep. Cross[-]examination, nothing, lunch. Now I'm hearing from you." (Tr. 502-03). Because of defense counsel's delay in objecting to the ARGUS video, the judge refused to declare a mistrial or give any curative instructions. (Tr. 505-10).

The defense called one witness, Christopher Acosta. Acosta witnessed the brawl in the street that preceded McClinton's death, but did not see who stabbed McClinton. (Acosta: Tr. 713-20, 728). Acosta testified that he was assaulted by McClinton and that he saw other people, including Santana's mother, take blows from a baseball bat in the street on the night of McClinton's death. (Acosta: Tr. 716-20).

At the close of the case the jury was charged, with the highest count against Santana being murder in the second degree. (See Tr. 861-62). On June 9, 2010, the jury convicted Santana of manslaughter in the first degree — a lesser included offense. (Tr. 863, 876, 888-90). On June 25, 2010, Santana was sentenced to 20 years in prison. See Sentencing Transcript, dated June 25, 2010 (attached as part of Attach. 4 to Docket # 28), at 1, 24; People v. Santana, 114 A.D.3d 557, 557 (1st Dep't 2014).

B. State-Court Appeal and Collateral Review

Santana appealed his conviction to the First Department of the Appellate Division. Santana raised three grounds on appeal: (1) that his counsel was ineffective because he failed to review the ARGUS video before it was introduced into evidence; (2) that his counsel was ineffective because he "failed to understand the law as to missing witness instructions," thereby resulting in a damaging summation; and (3) that Santana received an "unduly harsh and excessive" sentence. Pet. Appeal Brief at 2.

On February 20, 2014, the Appellate Division unanimously affirmed Santana's conviction. Santana, 114 A.D.3d at 557. As an initial matter, the Appellate Division said that some of Santana's ineffective assistance claims were "unreviewable on direct appeal because they involve[d] matters not reflected in . . . the record." Id. The court held that "to the extent the existing record permits review of these claims, we find that defendant received effective assistance under the state and federal standards." Id. (citations omitted). The court concluded that Santana failed to show that his trial counsel's representation "fell below an objective standard of reasonableness," or "deprived [Santana] of a fair trial or affected the outcome of the case." Id. In addressing the ineffective assistance claim related to the missing witness issue, the court found that — despite trial counsel's misunderstanding of the law related to missing witnesses — Santana did not establish prejudice, in part because "the evidence of [Santana's] guilt was overwhelming." Id. at 558. Finally, the court stated that it "perceive[d] no basis for reducing [Santana's] sentence," and affirmed Santana's conviction. Id. The Court of Appeals denied Santana's request for leave to appeal on August 12, 2014. People v. Santana, 23 N.Y.3d 1067, 1067 (2014).

On December 9, 2014, Santana, acting pro se, moved the Appellate Division for a writ of

coram nobis. <u>See</u> Notice of Motion for a Writ of Error Coram Nobis and Memorandum of Law in Support of Writ of Error Coram Nobis, dated Dec. 9, 2014 (attached as Ex. 12 to Braun Decl.), at 2. Santana claimed ineffective assistance of appellate counsel on the following two grounds: (1) appellate counsel failed to file a motion in the trial court pursuant to C.P.L. 440.10; and (2) appellate counsel failed to argue that trial counsel was ineffective "when he failed to object, argue, and/or preserve for appellate review that petitioner was subjected to prosecutorial misconduct." <u>See id.</u> at 5. Plaintiff's memorandum of law explained that the prosecutorial misconduct was (a) that the People failed to disclose the ARGUS video until after counsel's opening statement; and (b) that "the trial court erred in not granting a mistrial after trial counsel objected to the [ARGUS] video, thereby depriving him of [a] fair trial." <u>Id.</u> at 19, 22.[4] On September 29, 2015, in a summary order, the Appellate Division denied Santana's application for a writ of coram nobis. Order, dated Sept. 29, 2015 (attached as Ex. 14 to Braun Decl.).

On January 14, 2015, shortly after filing his coram nobis application, Santana moved <u>pro se</u> under New York Criminal Procedural Law section 440.10 to vacate his conviction. <u>See</u> Motion to Vacate Judgment Pursuant to CPL §440.10, dated Jan. 14, 2015 (attached as Ex. 8 to Braun Decl.). Santana alleged ineffective assistance due to his trial counsel's failure to (1) move for severance of the case; (2) object to inadmissible hearsay testimony in violation of the Confrontation Clause; (3) raise an extreme emotional disturbance defense; (4) file a post-conviction motion to set aside the verdict pursuant to CPL § 330.30; (5) timely object to admission of the ARGUS video; and (6) object "that defendant was subjected to prosecutorial misconduct." <u>Id.</u> at 11, 24, 30, 33, 35, 40 (capitalization omitted). The trial court denied the

---

[4] Santana does not explain how actions by the trial court could constitute "prosecutorial misconduct."

motion in a 39-page decision.  See Decision and Order, dated Dec. 22, 2015 (attached as Ex. 10

to Braun Decl.) ("440.10 Decision").  On April 4, 2016, the Appellate Division denied Santana's

request for review of that decision.  See Certificate Denying Renewal, dated Apr. 4, 2016

(attached as Ex. 11 to Braun Decl.).

C.  Procedural History of Current Federal Petition

Santana filed the instant petition seeking federal habeas review of his state-court

conviction on March 30, 2015.  Petition Under 28 U.S.C.A. § 2254 for Writ of Habeas Corpus

by a Person in State Custody, filed Mar. 30, 2015 (Docket # 1).  Santana was unrepresented at

the time.  After the Court ordered respondent to answer, Order to Answer, 28 U.S.C. § 2254,

filed June 18, 2015 (Docket # 3), the respondent asked the Court to hold the federal petition in

abeyance until the state court decided Santana's then-pending CPL § 440.10 motion and coram

nobis application.  See Letter  from Justin J. Braun, filed July 6, 2015 (Docket # 6).  Noting that

it could only consider exhausted claims, the Court stayed Santana's federal petition until the

state-court proceedings — and any appeals therefrom — were completed.  Order, filed July 7,

2015 (Docket # 7).  On April 28, 2016, the respondent informed the Court that Santana's state-

court proceedings were completed.  See Letter from Justin J. Braun, filed Apr. 28, 2016 (Docket

# 13).

Counsel later appeared on Santana's behalf and filed the amended petition on August 26,

2016.

II. GOVERNING STANDARDS OF LAW

A.  Legal Standard for Petitions Brought Pursuant to 28 U.S.C. § 2254

A petition for a writ of habeas corpus may not be granted with respect to any claim that

has been "adjudicated on the merits" in state court unless the state court's adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)-(2).

For a claim to be "adjudicated on the merits" within the meaning of section 2254(d), it must "finally resolv[e] the parties' claims, with res judicata effect," and it must be "based on the substance of the claim advanced, rather than on a procedural, or other, ground." Sellan v. Kuhlman, 261 F.3d 303, 311 (2d Cir. 2001) (citations omitted). As long as "there is nothing in its decision to indicate that the claims were decided on anything but substantive grounds," a claim will be considered "adjudicated on the merits" even if the state court fails to mention the federal claim and cites no relevant federal case law. Aparicio v. Artuz, 269 F.3d 78, 94 (2d Cir. 2001); accord Harrington v. Richter, 562 U.S. 86, 99 (2011) ("When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary.") (citation omitted); see also id. at 98 (section 2254(d) deference applies even "[w]here a state court's decision is unaccompanied by an explanation"). Moreover, a state court's "determination of a factual issue" is "presumed to be correct," and that presumption may be rebutted only "by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

A state court decision is "contrary to" clearly established federal law only "if the state court applies a rule that contradicts the governing law set forth" in Supreme Court precedent or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives" at a different result. See Williams v. Taylor, 529

U.S. 362, 405-06 (2000). Habeas relief is available under the "unreasonable application" clause only "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." See id. at 413. A federal court may not grant relief "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." Id. at 411. Rather, the state court's application must have been unreasonable — a standard that is met only "where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with" Supreme Court precedent. Harrington, 562 U.S. at 102; accord id. ("[E]ven a strong case for relief does not mean the state court's contrary conclusion was unreasonable.") (citation omitted). In other words, to demonstrate an "unreasonable" application of Supreme Court law, the habeas petitioner "must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Id. at 103; see also Woods v. Donald, 135 S. Ct. 1372, 1378 (2015) (per curiam) (an "extreme malfunction" by the state court in applying Supreme Court precedent is "required for federal habeas relief") (citation and internal quotation marks omitted).

The "determination of whether a court has unreasonably applied a legal standard depends in large measure on the specificity of the standard in question." Brisco v. Ercole, 565 F.3d 80, 89 (2d Cir. 2009). "The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations" inasmuch as the application of a general standard to a specific case "can demand a substantial element of judgment." Yarborough v. Alvarado, 541 U.S. 652, 664 (2004) (citation omitted). Thus, "where the precise contours of a right remain

unclear, state courts enjoy broad discretion in their adjudication of a prisoner's claims." Woods, 135 S. Ct. at 1377 (citation, brackets, and internal quotation marks omitted); accord Brisco, 565 F.3d at 90 (a court applying a "fact-dependent standard . . . . to the facts of a specific case is . . . entitled to significant 'leeway' when [a habeas court] review[s] its decision for reasonableness") (quoting Yarborough, 541 U.S. at 664).

Only holdings of the Supreme Court are considered for purposes of determining "[c]learly established federal law." Rodriguez v. Miller, 537 F.3d 102, 106 (2d Cir. 2008) (internal quotation marks omitted) (citing Williams, 529 U.S. at 412). Thus, "[n]o principle of constitutional law grounded solely in the holdings of the various courts of appeals or even in the dicta of the Supreme Court can provide the basis for habeas relief." Id. at 106-07 (citation omitted). Where there is "[n]o holding" from the Supreme Court on the question presented, see Carey v. Musladin, 549 U.S. 70, 77 (2006), or where Supreme Court cases "give no clear answer" to the question presented in the petition, see Wright v. Van Patten, 552 U.S. 120, 126 (2008) (per curiam) (citation omitted), a state court's decision can be neither contrary to nor an unreasonable application of clearly established federal law, see Knowles v. Mirzayance, 556 U.S. 111, 122 (2009) ("[I]t is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by this Court.") (citation and internal quotation marks omitted).

B. Ineffective Assistance of Counsel

To prove ineffective assistance of counsel, a petitioner must show that his "counsel's representation fell below an objective standard of reasonableness" and "must demonstrate a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Harrington, 562 U.S. at 104 (internal quotation marks omitted)

(quoting Strickland v. Washington, 466 U.S. 668, 688, 694 (1984)); accord Tavarez v. Larkin, 814 F.3d 644, 648 (2d Cir. 2016); United States v. Brown, 623 F.3d 104, 112 (2d Cir. 2010); Pham v. United States, 317 F.3d 178, 182 (2d Cir. 2003); see also Massaro v. United States, 538 U.S. 500, 505 (2003) ("[A] defendant claiming ineffective counsel must show that counsel's actions were not supported by a reasonable strategy and that the error was prejudicial."). In evaluating the first prong — whether counsel's performance fell below an objective standard of reasonableness — "[j]udicial scrutiny . . . must be highly deferential," and the petitioner must overcome the "presumption that, under the circumstances, the challenged action might be considered sound trial strategy." Bell v. Cone, 535 U.S. 685, 698 (2002) (alteration in original) (internal quotation marks omitted) (quoting Strickland, 466 U.S. at 689); see Dunham v. Travis, 313 F.3d 724, 730 (2d Cir. 2002) (according counsel a presumption of competence) (citation omitted). This analysis requires a court to "affirmatively entertain the range of possible reasons [petitioner]'s counsel may have had for proceeding as they did." Cullen v. Pinholster, 563 U.S. 170, 196 (2011) (citations and internal quotation marks omitted); see also Jackson v. Conway, 763 F.3d 115, 152-53 (2d Cir. 2014).

The second prong requires a showing of prejudice. To satisfy this prong, the petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694; accord Tavarez, 814 F.3d at 648. With respect to the second prong, the Second Circuit generally "requires some objective evidence other than defendant's assertions to establish prejudice." Pham, 317 F.3d at 182 (citing United States v. Gordon, 156 F.3d 376, 380-81 (2d Cir. 1998) (per curiam)); accord Melo v. United States, 825 F. Supp. 2d 457, 462 (S.D.N.Y. 2011). Unlike the

12

reasonableness prong, the prejudice determination "may be made with the benefit of hindsight."

Lynch v. Dolce, 789 F.3d 303, 311 (2d Cir. 2015) (internal quotation marks omitted) (quoting

Mayo v. Henderson, 13 F.3d 528, 534 (2d Cir. 1994)).  Thus, a court will take into account the

evidence against a defendant in deciding if the outcome of the trial would have been different

but for his attorney's performance.  See, e.g., United States v. Hasan, 586 F.3d 161, 170 (2d Cir.

2009) ("[G]iven the overwhelming evidence against [the defendant] at trial, [he] cannot show

prejudice . . . .").

 "The standards created by Strickland and § 2254(d) are both highly deferential, and when

the two apply in tandem, review is doubly so."  Harrington, 562 U.S. at 105 (internal citations

and quotation marks omitted).  A petitioner "must do more than show that he would have

satisfied Strickland's test if his claim were being analyzed in the first instance . . . .  Rather, he

must show that the [state court] applied Strickland to the facts of his case in an objectively

unreasonable manner."  Bell, 535 U.S. at 698-99.  Our task on habeas review is limited,

therefore, to asking whether the state court's "rejection of this claim amounted to an

unreasonable application of the Strickland standard."  Aparicio, 269 F.3d at 99 (citing 28 U.S.C.

§ 2254(d)(1)).

 C. Exhaustion and Procedural Bar

 "Before a federal court may grant habeas relief to a state prisoner, the prisoner must

exhaust his remedies in state court."  O'Sullivan v. Boerckel, 526 U.S. 838, 842 (1999); see 28

U.S.C. § 2254(b)(1)(A) ("An application for a writ of habeas corpus on behalf of a person in

custody pursuant to the judgment of a State court shall not be granted unless it appears that . . .

the applicant has exhausted the remedies available in the courts of the State . . . .").  Thus, a

petitioner is required to have presented each claim to all available levels of the state courts.  See,

13

e.g., Baldwin v. Reese, 541 U.S. 27, 29 (2004) ("[T]he prisoner must fairly present his claim in each appropriate state court (including a state supreme court with powers of discretionary review) . . . .") (citations and internal quotation marks omitted). The petitioner must also have fairly presented the "federal nature" of each claim to the state courts. Id.; Duncan v. Henry, 513 U.S. 364, 365-66 (1995) (per curiam); Rosa v. McCray, 396 F.3d 210, 217 (2d Cir. 2005).

Even where a claim has been exhausted, it may not be reviewed if the claim has been rejected based on a state procedural rule that constitutes an adequate and independent ground for the decision. The Second Circuit has summarized the law governing habeas review of claims dismissed under state procedural law as follows:

> This court is generally procedurally barred from considering a ruling that "fairly appear[s] to rest primarily on state procedural law." Jimenez v. Walker, 458 F.3d 130, 138 (2d Cir. 2006) (citation omitted). Even where the state court has ruled on the merits of a federal claim "in the alternative," federal habeas review is foreclosed where the state court has also expressly relied on the petitioner's procedural default. Green v. Travis, 414 F.3d 288, 294 (2d Cir. 2005) (citation omitted). To bar federal habeas review, however, the state court's decision must rest not only on an independent procedural bar under state law, but also on one that is "adequate to support the judgment." Jimenez, 458 F.3d at 138.
>
> A state procedural bar is "adequate" if it "is firmly established and regularly followed by the state in question" in the specific circumstances presented in the instant case. Monroe v. Kuhlman, 433 F.3d 236, 241 (2d Cir. 2006) (citation omitted). The "guideposts" for analyzing the issue of adequacy, articulated in the context of a procedural default occurring at trial, are:
>
>> (1) whether the alleged procedural violation was actually relied on in the trial court, and whether perfect compliance with the state rule would have changed the trial court's decision; (2) whether state caselaw indicated that compliance with the rule was demanded in the specific circumstances presented; and (3) whether petitioner had "substantially complied" with the rule given "the realities of trial," and, therefore, whether demanding perfect compliance with the rule would serve a legitimate governmental interest.

Cotto v. Herbert, 331 F.3d 217, 240 (2d Cir. 2003) (citation omitted). The Cotto

> guideposts also apply to testing the adequacy of a procedural default raised in a state collateral proceeding. See, e.g., Clark v. Perez, 450 F. Supp. 2d 396, 426 (S.D.N.Y. 2006). Because of comity concerns, a decision that a state procedural rule is inadequate should not be made "lightly or without clear support in state law." Garcia v. Lewis, 188 F.3d 71, 77 (2d Cir. 1999) (citation omitted).

Murden v. Artuz, 497 F.3d 178, 191-92 (2d Cir. 2007) (alteration in original). The Second Circuit has cautioned, however, that "the Cotto factors are not a three-prong test: they are guideposts to aid inquiry, so there is no need to force square pegs into round holes." Clark, 510 F.3d at 391 (internal citation omitted).

If a claim is procedurally barred, a petitioner may obtain review of the claim only if he demonstrates "cause and prejudice for the procedural default," or that the "constitutional violation has probably resulted in the conviction of one who is actually innocent of the substantive offense." Dretke v. Haley, 541 U.S. 386, 393 (2004) (citations and internal quotation marks omitted); accord Gutierrez v. Smith, 702 F.3d 103, 111 (2d Cir. 2012); Murden, 497 F.3d at 194.

## III. DISCUSSION

We address next the claims raised in the petitioner's memorandum of law.

### A. Abandoning the Justification Defense

Santana argues that "it is clear that counsel's defense of Mr. Santana was justification" at start of the trial. Pet. Mem at 11. He argues that this trial strategy "could only be supported by the introduction of Mr. Santana's inculpatory statement" or the testimony of some other fact witness. Id. at 12. The rest of Santana's argument on this point is not clear. See id. at 12-13. As best we can tell, Santana is arguing that the justification defense should not have been pursued to begin with because it raised expectations in the jurors that were ultimately not met when the justification defense was not further adverted to.

If that is the argument, it must be rejected inasmuch as counsel's statements to the jury never raised such expectations. It is true that counsel asked questions of prospective jurors during voir dire as to whether they would try to defend their mother if she were attacked. See Transcript of Sandoval Hearing & Jury Voir Dire, dated May 17, 2010 (attached as Attach. 1 to Docket # 28), at 133. But this questioning had been preceded by the prosecution's own questioning on this topic when it had asked jurors whether, knowing that the victim had struck defendant's mother with a baseball bat, they would "close [their] ears and say, well, that's it. Somebody's mother gets hit in the head, all bets are off. Anything happens to you after that, you've got it coming." Id. at 106. It was not ineffective for Santana's counsel to try to get jurors to admit they would want to protect their mother even if counsel had no plan to offer a justification defense.

During voir dire, Santana's counsel explored several topics concerning self-defense. Id. at 134-35, 207-08. This too was a reasonable trial strategy given that a videotaped statement existed in which Santana claimed to police he had stabbed McClinton because McClinton was swinging a bat at him. 440.10 Decision at 2 n.2, 26, 29, 34-35; Tr. 31, 505. If the prosecution had ultimately chosen to introduce that statement at trial it might well have proven necessary for defense counsel to embrace in some form his client's claim on the videotape that he had acted in self-defense.

In his opening, Santana's counsel asked the jury to pay attention to "two oral statements [Santana made] to Detective Heanue about what happened . . . and what he had to do to defend himself and his family." (Tr. 31). The reference to this statement during opening was entirely reasonable inasmuch as Santana had actually made these statements and it might have looked strange, had they later been introduced by the prosecution, if defendant's counsel had made no

reference to them. Counsel could not have known at that time that the prosecution would decide

not to introduce Santana's videotaped statement. It was only after the opening statements that

counsel learned that the prosecution did not intend to introduce Santana's statement on self-

defense. Tr. 505; 440.10 Decision at 29, 35.[5]

Thus, we find nothing improper in counsel's conduct in addressing these matters absent

any plan to present a justification defense.

B. Counsel's Stipulation to the Admission of the ARGUS Videotape

Santana's brief on the admission of the ARGUS videotape is similarly devoid of

argument. It simply summarizes the statements of counsel, the prosecution, and the court as to

the admission of the videotape. Pet. Mem. at 13-15. The accompanying petition faults counsel

for "fail[ing]to object to the introduction" of the ARGUS videotape, Am. Pet. at 6, but there is

no explanation of how counsel could have argued that it was inadmissible. The videotape was

obviously relevant and there is no suggestion that there was a potential challenge to its

authenticity. As the 440.10 court found:

> The video was relevant and material to the issues the jury had to decide, and, as
> the trial court observed, while it was vivid it did not add anything radically new to
> the other evidence, including other videotapes of defendant's actions.

440.10 Decision at 37.

While he does not make the argument in his petition, Santana had previously argued that

counsel was ineffective for failing to review the ARGUS videotape prior to its admission. Pet.

Appeal Brief at 21, 24-35. But as the 440.10 court found, the portion of the videotape at issue

---

[5] The remaining statement quoted by Santana, see Pet. Mem. at 12, was a statement
made by counsel to the Court out of the jury's presence, and thus could not have raised any
expectations on the part of the jury that a justification defense would be raised.

was simply not included in the materials that had been supplied to defense counsel prior to trial. 440.10 Decision at 32. Thus, defense counsel was not ineffective in failing to review it.

C. Failing to Question a Juror

During the prosecution's case in chief, a juror "indicated to one of the court officers that he knew a spectator in the audience." (Tr. 551-52). At first the prosecution thought the audience member was a secretary from the Bronx District Attorney's Office (see Tr. 552), but after hearing the juror describe the person in the audience, the prosecutor handling the case realized that the audience member was "really an Executive Assistant DA . . . in the office." (Tr. 555-56). The court questioned the juror as to what he knew of the person and whether he had any contact with her during the trial. (Tr. 552-55). The juror stated that he "used to live across the street from her when [he] was like six years old"; his "mother was friends with her"; his "mother knows her very well"; he knew "her sons very well"; and "[s]he used to baby-sit" him. (Tr. 553-54). The juror confirmed that he had told no fellow jury members about his recognition of the person in the audience. (Tr. 554). The juror also stated that he moved out of the old neighborhood where he knew the woman from and would not have any contact with her or her children during the trial. (Tr. 554-55). The court asked the juror if "there [was] anything about the fact that [he] recognized somebody in the audience that would affect [his] ability to be fair and impartial," to which he answered "No . . . ." (Tr. 555). Defense counsel and the prosecutor declined to ask any questions of the juror. (Tr. 555). Santana argues that defense counsel improperly failed to "make any inquiry of this juror." Pet. Mem. at 17.

While the respondent cogently argues that this claim is unexhausted, it is simpler to address it on the merits as is permitted by 28 U.S.C. § 2254(b)(2). Although Santana states that his counsel's "failure to inquire about the juror's competence to continue on the case violated the

petitioner's right to effective counsel," id. at 18, he points to no potential questions that should have been asked.  In light of the trial judge's own extensive inquiry of the juror (Tr. 552-55), we cannot say that counsel was ineffective in declining to add to the colloquy.

   D.  Eliciting Hearsay Statements from Detective Heanue

   Santana faults his trial counsel with "open[ing] the door to damaging hearsay testimony," through his cross-examination of Detective Heanue.  Pet. Mem. at 18 (capitalization omitted).  In cross examining Detective Heanue, Santana's attorney inquired about his investigation of (1) Ray Sanchez, a participant in the street brawl that preceded McClinton's death, and (2) Fernando Valentine, a witness who spoke to detectives about the night of McClinton's death.  Sanchez was a person present at the scene of the crime whom defense counsel appears to have wanted to paint as a potential suspect that the police overlooked in their investigation.  Tr. 471-81; 440.10 Decision at 19.  By cross-examining Detective Heanue about statements that had been given to him by Sanchez and Valentine, Santana's trial counsel opened the door to other statements that were unhelpful to Santana's case, including statements Valentine made to police to the effect that Sanchez had not stabbed anyone, McClinton no longer had a bat when he was killed, and Santana and the co-defendant were armed with knives on the night of McClinton's death.  (See Tr. 489-91, 497).

   The 440.10 court dealt extensively with this issue, stating:

   Counsel's questioning about Fernando Valentine was clearly part of an overall strategy of impeaching the police investigation of the stabbing, despite the re-direct examination that it generated.  On cross-examination of [Police Officer] Ponce, counsel established that Ponce arrested Ray Sanchez and vouchered his bandana, cell phone and cell phone case, but not his bloodstained shirt.  On cross-examination of Tiffany McClinton, counsel established that Sanchez was present when the fighting got out of hand.  On cross-examination of Riggins, counsel established that Riggins did not see Sanchez during the altercation or near Kenneth McClinton although he was outside, an apparent contradiction to

19

Tiffany's testimony. On cross-examination of Heanue, counsel established that Heanue knew Sanchez was in custody but did not know that Sanchez had blood on his shirt. Counsel also established through Heanue that Ray Sanchez could be seen in the ARGUS video with what appeared to be a knife in his hand, that Fernando Valentine told Heanue that Sanchez had a knife, and that Sanchez had made a written statement to Heanue at the 46 Precinct before being released on the direction of the Bronx District Attorney's Office. Counsel established that no DNA samples from Ray Sanchez were submitted to the OCME Forensic Biology Department for comparison with any evidence recovered.

On re-direct examination, Heanue testified that Valentine also said that defendant and [co-defendant] had knives; that Kenneth's cousin had taken the bat away from Kenneth, and that it was clear to Heanue after speaking with Valentine that Valentine knew defendant and [co-defendant] well and that Sanchez had not stabbed anyone. [Defense counsel] did not object to this testimony, but because the jury did not hear that Valentine said that defendant and [co-defendant] stabbed McClinton, it added little to the evidence against them. After all, defendant and his brother were clearly visible on several videotapes holding knives, both Tiffany McClinton and Riggins testified that defendant stabbed Kenneth, and defendant had the victim's DNA on his clothes. It therefore seems clear that counsel made a strategic decision to open the door to this testimony in order to add evidence to his attack on the decision to release Sanchez.

440.10 Decision at 19-20 (internal citations omitted).

While Santana's claim would fail on the merits because counsel's performance was not ineffective for the reasons stated in the portion of the 440.10 Decision quoted above, we agree with the respondent that the claim is procedurally barred. See Resp. Br. at 21-25. Santana did not raise the claim on direct review and the 440.10 court ruled in the alternative that this claim was "procedurally barred," under N.Y. Crim. Proc. Law § 440.10(2)(c) because it was record-based. See 440.10 Decision at 21-22. Thus, this constitutes an "independent" ground for dismissal.

Applying the Cotto factors, the ruling is also "adequate" because it is "firmly established and regularly followed." Murden, 497 F.3d at 192. With respect to the first guidepost, Santana's failure to raise any of these issues in his direct appeal was "actually relied on" by the

trial court.  See 440.10 Decision at 22.  Had the issues been raised on direct appeal, the Appellate Division could have addressed them on the merits.

As for the second guidepost, it is well-settled under New York law that where the record is sufficient to allow appellate review of a claim, the failure to raise that claim on appeal precludes subsequent collateral review of the claim.  See, e.g., People v. Cooks, 67 N.Y.2d 100, 103-04 (1986) (citations omitted); People v. Maldonado, 34 A.D.3d 497, 498 (2d Dep't 2006); People v. Jossiah, 2 A.D.3d 877, 877 (2d Dep't 2003); People v. Skinner, 154 A.D.2d 216, 221 (1st Dep't 1990).  The same rule applies to bar collateral review where the facts underlying an ineffective assistance claim appear on the record.  See, e.g., Maldonado, 34 A.D.3d at 498; Jossiah, 2 A.D.3d at 877; People v. Smith, 269 A.D.2d 769, 770 (4th Dep't 2000); People v. Orr, 240 A.D.2d 213, 214 (1st Dep't 1997).

The third guidepost likewise fails to help Santana since there is no possible argument that he "substantially complied" with the state procedural rule.

Accordingly, the state procedural rule is "adequate" to preclude federal habeas review of Santana's ineffective assistance claims.  This conclusion is consistent with rulings in many federal habeas cases which have held that, where an ineffective assistance of counsel claim is record-based, section 440.10(2)(c) constitutes a procedural rule that is "firmly established and regularly followed" and thus "adequate."  See, e.g., Clark v. Perez, 510 F.3d 382, 393 (2d Cir. 2008); Sweet v. Bennett, 353 F.3d 135, 139-40 (2d Cir. 2003); Rodriguez v. Smith, 2015 WL 6509153, at *14 (S.D.N.Y. Oct. 28, 2015); Cromwell v. Smith, 2014 WL 1280287, at *11 (S.D.N.Y. Mar. 25, 2014).[6]

---

[6] By contrast, where the ineffective assistance claim is not record-based, federal habeas courts have held that the rule of CPL § 440.10(2)(c) is not "adequate."  See, e.g., Pierotti v.

Santana has made no effort to demonstrate "cause" that would excuse his failure to raise this issue in his direct appeal. In addition, he has not shown that, absent review, there would be a "fundamental miscarriage of justice," which requires a demonstration of "actual innocence." See, e.g., Dretke, 541 U.S. at 393 (citing Murray v. Carrier, 477 U.S. 478, 496 (1986)); accord Gutierrez, 702 F.3d at 111; Dunham, 313 F.3d at 730.

Santana cites to Martinez v. Ryan, 566 U.S. 1 (2012), and Trevino v. Thaler, 133 S. Ct. 1911 (2013), to argue that, because he acted pro se throughout his 440.10 petition, the court should "consider all the claims presented" in the petition, including his claim concerning Detective Heanue's testimony. See Pet. Mem. at 9-10. Martinez and Trevino are of no assistance, however, because they stand only for the proposition that ineffective assistance by a prisoner's state post-conviction counsel — or lack of representation at that stage — may serve as cause to overcome the default of an ineffective assistance of trial counsel claim where the State effectively requires a defendant to bring that claim in state postconviction proceedings rather than on direct appeal. See Martinez, 566 U.S. at 6, 9, 17; Trevino, 133 S. Ct. at 1922. Putting aside the fact that Santana was not represented by counsel in his post-conviction proceeding, the Martinez/Trevino exception does not apply here because the State of New York does not require that record-based ineffective assistance of counsel claims be brought in a post-conviction proceeding. See, e.g., Jossiah, 2 A.D.3d at 877; Smith, 269 A.D.2d at 770; Orr, 240 A.D.2d at 214.

_____

Walsh, 834 F.3d 171, 177 (2d Cir. 2016) (noting that section 440.10(2)(c) is firmly established and regularly followed, but holding that a claim of ineffective assistance based on out-of-record evidence need not be raised first on direct appeal); Fulton v. Graham, 802 F.3d 257, 263 (2d Cir. 2015) ("[T]he weight of state case law suggests that New York courts do not ordinarily apply § 440.10(2)(c) to bar claims of ineffective assistance based on out-of-court conversations between a defendant and his counsel.").

For these reasons, Santana's claim of ineffective assistance of counsel based on his trial counsel opening the door to hearsay statements from Detective Heanue is procedurally barred.

E.  "Missing Witness" Issue

Petitioner argues that counsel's "failure to understand the law led directly to the use of highly inflammatory and prejudicial comments by the prosecutor." Am. Pet. at 6-7; Pet. Mem. at 21-24.[7]

As already noted, the defense called one witness, Acosta, who testified that he was assaulted by a bat-wielding McClinton and that he saw other people, including Santana's mother, receive blows from a baseball bat on the night of McClinton's death.  (Acosta: Tr. 717-20).  After the direct examination of Acosta concluded, the prosecution made an application for a missing witness charge on the ground that Santana's mother and other family members could have testified to these facts.  (See Tr. 765-69).  The judge was initially inclined to grant the application.  (Tr. 769).  In explaining why he did not wish to call Santana's mother, defense counsel said that "her testimony . . . would incriminate my client, based upon my conversations with her."  (Tr. 785-86; accord Tr. 787).  After initially granting the prosecution's request for a missing witness charge, the trial judge ultimately reversed himself and denied the request.  (See Tr. 790-92, 794).  However, the trial judge permitted the prosecution to comment in summation on the fact that Santana called Acosta, but not Santana's mother or step-father who were present during the street brawl that preceded McClinton's death.  (Tr. 794-95).  Santana's counsel agreed that this was appropriate.  (Tr. 795).  The prosecutor took advantage of this opportunity.  In summation, the prosecutor stated:

---

[7]  The brief in support of the petition erroneously suggests that there was a "missing witness charge."  In fact, no such charge was ever given.

Now let's talk for a minute about a couple of the eyewitnesses to the event . . . .
Most of them are [defendants'] family members. . . . The person who stood there
and saw it all was their mother and she didn't make it from the last row to the
witness stand. What do you think that means?

(Tr. 831). The prosecutor stated that an argument by co-defendant's counsel that "only two

people came to court to talk about [the murder] because . . . everybody scattered," was incorrect

because "four people came to court who saw it, two testified and you found out on Thursday that

two of them sat over there and didn't take the stand" — apparently referring to Santana's mother

and step-father. (Tr. 834). Counsel objected to this statement but the objection was overruled.

(Tr. 834-35). The prosecution continued on this line of reasoning and stated that

Alex Santana saw fit to put on a case. [He c]alled Christopher Acosta here on
Thursday who told us precisely nothing, except we found out that [Santana's
mother], the catalyst for all this, was sitting in the back row. [Santana] flew a guy
twenty-five hundred miles to tell you nothing and the defendant's mother, who
gave birth to him, who sat twenty-five feet away and wouldn't make the trip.
What mother could be kept off the witness stand with a team of wild horses if
they could help out their son?

(Tr. 835). Counsel objected and the court sustained the objections, though no curative

instruction was given. (Id.). The prosecutor then concluded his comments on Santana's mother

by calling her a "moral" and "maternal" accomplice to the murder of McClinton. (Id.).

In addressing the ineffective assistance claim related to this argument, the Appellate

Division stated:

The only aspect of defendant's ineffective assistance claim that is reviewable on
the present record is his claim relating to the argument that his counsel made in
opposition to the People's request for a missing witness charge. We agree that
counsel's argument that an uncalled witness's testimony would incriminate
defendant did not militate against a missing witness charge, and that counsel thus
demonstrated a misunderstanding of the law. However, defendant has not
established that counsel's error caused any prejudice. The court denied the
People's request for the missing witness charge, and only permitted the People to
make a very limited summation argument in this regard. Defendant has not
shown how this limited argument affected the outcome of the case or deprived

24

him of a fair trial. We note that the evidence of defendant's guilt was
overwhelming.

Santana, 114 A.D.3d at 557-58 (internal citation omitted).

We will put to one side the question of whether counsel's conduct in opposing the

missing witness charge shows ineffective assistance because it is clear that Santana has not

shown prejudice. Indeed, his brief does not even address the question of prejudice.

The question thus becomes whether the Appellate Division's rejection of Santana's

argument amounted to an unreasonable application of the Strickland standard — that is, whether

Santana has shown "a reasonable probability" that, but for his attorney's conduct as to the

request for the missing witness charge, which led to his agreeing to allow the comments in

summation, Santana would not have been convicted. We cannot say that the Appellate Division

acted unreasonably in making this determination. As the Appellate Division held, the evidence

of Santana's guilt was "overwhelming." Id. at 558. There was video evidence showing Santana

carrying two knives as he approached the area where McClinton was killed; a knife recovered

from the crime scene had Santana's DNA on the handle and McClinton's blood on the blade;

Santana was wearing a shirt stained with McClinton's blood; and two witnesses actually saw

Santana stab McClinton. 440.10 Decision at 2-6. If the prosecution's reference to Santana's

mother in summation were omitted, there is virtually no chance, let alone a "reasonable

probability," that the jury would have declined to convict Santana. Thus, the Appellate Division

did not make an unreasonable application of the Strickland standard when it found no prejudice

arising from counsel's conduct.

Accordingly, this basis for habeas relief fails.

## IV. CONCLUSION

We thus find that none of the claims for relief should be granted. We also reject any argument, see Pet. Mem. at 9, that the cumulative effect of any errors meets the Strickland standard. Accordingly, the petition for a writ of habeas corpus should be denied.

### PROCEDURE FOR FILING OBJECTIONS TO THIS REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties have fourteen (14) days (including weekends and holidays) from service of this Report and Recommendation to file any objections. See also Fed. R. Civ. P. 6(a), (b), (d). A party may respond to any objections within 14 days after being served. Any objections and responses shall be filed with the Clerk of the Court, with copies sent to the Hon. William H. Pauley, III at 500 Pearl Street, New York, New York 10007. Any request for an extension of time to file objections or responses must be directed to Judge Pauley. If a party fails to file timely objections, that party will not be permitted to raise any objections to this Report and Recommendation on appeal. See Thomas v. Arn, 474 U.S. 140 (1985); Wagner & Wagner, LLP v. Atkinson, Haskins, Nellis, Brittingham, Gladd & Carwile, P.C., 596 F.3d 84, 92 (2d Cir. 2010).

Dated: August 10, 2017
      New York, New York

GABRIEL W. GORENSTEIN
United States Magistrate Judge

26